Good morning. May it please the court, my name is Laura Wolfe and I have the honor of representing the state of Alaska today. So I'd like to tell you a little more about Alaska because I think the context is really important in understanding Anilka. Counsel, you may want to lower your mic a little bit more. Thank you. So Alaska is really unique. First of all, it's huge. It's a fifth of the size of the entire lower 48 and 80% of the state is not accessible by road. Over half of the state is federal lands and it's home to roaming and migratory herds of animals, to prolific salmon runs. Those animals, they don't recognize boundaries between state and federal land. And so when Alaska became a state in 1959, it was of the utmost importance to Alaskans that the state be able to cohesively and comprehensively manage these animals throughout the entire state. That's what the Alaska Statehood Act did and that's what it provided for. Counsel, can you address the statutory text about the access provision in the focus order? Sure. So that talks about physical access. What do you have authority that limits access in that way? Sure. So the reason why it talks about physical access, I'm going to first discuss what that physical access is and then why you should read the statute that way. So it's about physical access to a resource like easements or using motorized vehicles. And that's your argument. But access, as it's plainly defined, includes authorization. It does not necessarily mean physical access. So I would look at the rest of ANILCA and the way access is used throughout ANILCA, it's always about physical access. And that's why I started with telling you a little bit about Alaska, about how 80 percent is not accessible by roads, about how big it is, about how there are private and public lands and inholdings. So you can look at sections, for instance, 16 U.S.C. 3170, 3171, and 3210. Those are all about access. When there's inholdings, like little enclave sort of inholdings, access with snow machines, that's also how the federal government uses the term and its regulations, 36 C.F.R. 21281, that describes one type of land. One type of access over snow. So I understand your argument is that right in statutory context, access is referred to as physical access. It is. And just one more example. So, for instance, if there is, you know, I said 80 percent not accessible by roads, but there are parts of Alaska that are accessible by roads, right? So if you were to read access so broadly, that would include if there are resources right next to a road or right next to a village and are very easily accessible, but the season has not closed, sorry, the season has not opened yet, the hunting season. If you were to read access so broadly, then you would say access also includes even when it is very physically easy to get to and that's simply not what Congress intended. Going back to the section on which the board relies, my understanding or framing to be is that when the season is open and then has to be restricted, then some priority can be given. But isn't the whole purpose of having closed and open seasons to ensure the well-being of the managed wildlife population? Like, in a grand sense, if there were abundant wildlife and there were no concerns about their continued well-being, you wouldn't need to ever close hunting season. I guess so, but I think when ANILCA was passed, if you look at, for instance, the findings and the policy statement in Section 8, as well as the legislative history, what Congress understood at that point is that there were some dwindling populations and also part of Alaska was becoming more accessible by road and there was a big population boom because of the pipeline, and so there were a lot more people wanting to hunt and that was created. Ultimately, it seems to me to be largely a narrowing of your focus. If the season is closed to all hunters, subsistence and non-subsistence, and then there is a need for subsistence hunting, it is a prioritization during the closed season of subsistence hunting to have a limited reopening. You're saying only look at the times when it's open and then if we close it during an open season, then you can prioritize, but that just seems to me you could just take one step back and say when we close it to protect the population, we can prioritize subsistence hunting by having a limited reopen. So I think going back to both the structure, the purpose of ANILCA and what Congress intended, it just didn't intend that capacious of a definition. In the purposes of ANILCA, it says to ensure the continued well-being of subsistence hunting communities. The continued well-being from generation to generation, which is what Alaska does already. Congress passed ANILCA only 20 years after the Statehood Act and that was still fresh in Congress's mind. Congress made a narrow exception in Title VIII, which allows the secretaries again to restrict state hunting rules on federal land, but that doesn't allow for opening. If the federal government has the authority to open seasons, what that does is Alaska has to constantly react, including reducing hunting not just on federal lands, but on state lands too, and that is such an overreach. Obviously ANILCA is only supposed to be about federal lands, but if there is no more harvestable surplus or reduced harvestable surplus because there's a harvest debt from an opening, then the state has to reduce possibly to zero hunting throughout the entire state. Can I ask you, let's talk about those numbers, right? Since 2020, Alaska hunters have harvested 26,685 bull moose and 45,736 deer, and so you're saying the fact that two bull moose and five buck deers were harvested during the pandemic for food shortage reasons, that that is going to require Alaska to go down to zero? Is that what you're arguing? So if you look at our brief, we don't talk about four years statewide. We talk about the area. No, but I just want to understand your argument. You're saying the fact that seven total moose and deer when Alaska is allowing almost 80,000 to be hunted for recreational and commercial purposes, that that is going to force Alaska to go down to zero. That's your argument. So my argument is not in this case that it will be zero. My argument is that it creates a harvest debt from, say, 56 to 50, for instance, in this case. Let me ask you, kind of on the same lines of what Judge Sung was asking. Let's say the state decided to, for whatever reasons, to close hunting for multiple years. Then how would the federal government be able to effectuate its mandatory preference priority obligations under this statute without being able to open a hunt? The only reason the state closes hunting is if there isn't a harvestable surplus. So ANOCA was passed against the backdrop of the Alaska Constitution and Alaska statutes, which require development of wildlife resources, which require maximum use of wildlife resources, which require sustained yields. In that situation, the federal government would just not be able to fulfill its obligation to provide for the continuation of subsistence use. If there isn't a harvestable surplus, that means you can't open a season because the population will start dwindling and dwindling and dwindling to zero. That's why Alaska has, it opens whenever it is possible. It is required to open by Constitution, by law, whenever it is possible. Alaska statutes require management to maximize wildlife production, basically for hunting. And ANOCA was passed against that backdrop, against that understanding. Let's say we read ANOCA to be silent as to how the priority or preference is supposed to be effectuated. Then why can't Section 814 fill that gap? So I think the best way to think about preemption is to, and I think when you look about, it can't be silent. It has to be expressed. And if you look at the preemption clause in 3202, you have to read that narrowly. Well, let's read 814. And then throughout the statute, it says what these responsibilities are, and they are to provide for the continuation or the opportunity for subsistence uses. So I guess I'm unclear on why that wouldn't give that authority. I think you can't use a clause that says to enact regulations to provide for a policy statement. I think the policy statement and the findings can help you understand what the substantive operative provisions are. I have cited things in my brief for that proposition. It's, I can't remember the cases right now, but it's right next to interpreting case law by Scalia and Garner and how to appropriately interpret case law. I think, well, actually, I know Sturgeon says that U.S. Supreme Court case. The question here, and there's really, there's two questions, issues we're talking about, federal regulation areas for traditional state control and also delegation of discretionary decision-making outside the federal government. In order to do both of those things, you need express congressional intent, not silence. And that is... Let's look at the Alaska Attorney General's statement where he says the secretary, after asserting federal control over subsistence management, will be required by law to direct the National Park Service and the U.S. Fish and Wildlife Service to draft and immediately implement substantive fish and game management regulations, including such subjects as seasons, tag limits, et cetera. I mean, clearly the state of Alaska has switched its position, correct, over time. At one point, the attorney general of your state had a different view of these statutes than the state currently does. Is that correct? What I would say is there was an informal attorney general, you can come and look at the informal attorney general. There's formal attorney general opinions and there's informal attorney general opinions. You come look at our library at the informal attorney general opinions, there are a lot of them from the 80s. And some of them were vetted a little more than the others, and I agree that that is something that was published. And I think that's a, hey, worst case scenario, this is how we see it happening, which is what has happened, worst case scenario, but that's not what should be happening, according to the text. I don't see anything in here saying worst case scenario. I see this as this is our understanding of this statute. Yes, and I think that has to be looked at in the context of what the difference between an informal and a formal opinion is, and, for instance, how the Alaska Supreme Court even interprets and how it weighs attorney generals' own opinions, which does not give much persuasive weight, actually. And many of these hunts actually took place, and the state didn't object previously. And I assume you're saying all of those were unlawful, but the state forfeited its right to challenge it. Is that right? I would look at, on the record, pages 51 to 56. Yes, the state didn't put up a big stink before. Well, it didn't put up any stink with regard to some of these openings, correct? I mean, I'll go through, if you want me, the years and the animals, but I think you know what I'm referring to. So at least in those instances, the state chose not to challenge them, and you have an attorney general position that says, we think the federal government is authorized to do what it did. So sometimes what the state does is it reacts, and then it opens early, too, on state land. So it reacts in lots of different ways instead of using an office that doesn't have a ton of resources and attorneys. It reacts by opening. That sort of counters your more practical argument that somehow this is going to decimate the population. I mean, if the state reacts to an emergency opening by opening more. So what it does is, so there's two different things that can happen. When I say decimate the population, what I mean, I don't mean decimate the population. I mean take the entire harvestable surplus. It's a difference. So let's say there is a season for hunting, and the federal subsistence board opens up the season 10 days early, only on public land for only federally qualified subsistence users, and the entire harvestable surplus is taken. That means the state has to then close hunting throughout. I guess I'm still kind of boggled by these numbers. Harvest of two bull moose when the state allowed commercial and recreational hunting of 26,685 bull moose. I feel like the sky is falling. It's a bit of a challenge for me to see, to be honest. The state allowed 45,736 deer to be commercially and recreationally harvested, and you're saying five during a pandemic when people were hungry and didn't have enough food because of supply chain shortages is going to somehow break the system? So the principle, the question is not what happened here. It is the principle and what ANOCA allows. And so if you are looking at the preemptive clause, the preemptive clause says that states manage wildlife except as in Title VIII. I understand that argument from your briefing, but I want to just clarify something that you said earlier. So you're saying that if the emergency opening allows five, for example, deer, and then the harvestable surplus for that year was 50, and it went down to 45, and if the state didn't reopen early, I think what your concern is then maybe there wouldn't be enough for non-substance hunters in the state. Is that your concern? It's not really the concern here. In general, your concern, the reason why the state would reopen early in response to an emergency reopening for subsistence hunters is to allow non-substance hunters to get some of that take. Is that correct? On state lands, not on federal lands, but that would only happen if it's going to wipe out the entire harvestable surplus. In this situation, what happens is the state has to react. And so if there's an emergency hunt here, and there's an emergency hunt there, and there's an emergency hunt there, then the state is constantly... Your concern about all the harvestable take going to subsistence hunters. No, that is not the concern. That's the concern only if the entire harvestable surplus is going. The concern in this particular case is about having to react in order to holistically manage and to make sure, oh, wait, we are adjusting our levels to make sure, because say there's only 56 animals that can be harvested that year in that area, not statewide, which is, again, a fifth of the entire United States size for four years, but in that area, because then we have to make sure we have enough for the next year and the next year and the next year. And so we have to make sure we are constantly adjusting. And it's constantly adjusting to this emergency hunt, to this emergency hunt. And when I said, please look at the record on page 51... But let me ask you a question. The prior instances where the federal government opened hunting, you know, 1995, 2012, 2016, there were more instances. Were those all unlawful? Or did they in any way, those were lawful? All the openers are unlawful when the state has closed the land. Yes, I see I only have two minutes. I'd like to save a little bit of time for my rebuttal. That's fine. Thank you very much. Thank you. Morning. Kevin McCardle on behalf of the Federal Subsistence Board and may it please the court. Very briefly on the notion that these subsistence hunts are going to cause conservation concerns or interfere with state management objectives. There's no support for that whatsoever in the record. The board in this particular instance, which is the only one before the court, found on SCR 53 that this hunt will raise no conservation concerns for the affected species. There's no contrary evidence. But how is the state going to get data on the hunting that's done when the federal government opens? Well, the limitations on the number of animals that was provided in the order here. And more generally... So they just have to look at the documents of the federal government to get those numbers? Well, yes, and they're typically involved in decision making as they were in this case. We looped them in. There was a hearing. Our decision, the board's decision was publicized. So everyone knew the full extent of the harvest that was allowed here. The board found no conservation concerns, even if the maximum was taken, which it wasn't. And there's no contrary evidence in the record. And more generally, the speculation about how future emergency actions, if they happen at all, could affect state management were required as well to – under section 31.12, subparagraph 1 – to take actions that are consistent with sound management principles and with the conservation of healthy populations of fish and wildlife. And we also explained when we promulgated the regulations in 1992 that our responsibilities are twofold – to conserve healthy fish and wildlife populations and to ensure that non-wasteful subsistence uses are accorded priority over other uses. And that's 57 Federal Register 22940. So those are the objectives we managed for, and there's nothing that would support the conclusion that if you do that... determined that the district court's mootness ruling was incorrect, then why shouldn't that leave open the door that the state's improper delegation claim was also – leave that to be litigated later because the district court also improperly dismissed that as moot? Because the court never – the prior panel never addressed whether that claim was also capable of repetition, yet evading review, because Alaska didn't press the claim. So instead of addressing mootness at that point, the court said the claim's forfeited. And that disposed of it. They didn't say it was forfeited today, but come back tomorrow, they said it's forfeited. And then they remanded the panel for a decision of one specific claim. And the court's – district court's decision to entertain other... Okay, but if it was forfeited, then how was it before the prior panel? And how was it disposed of and finally settled by the prior panel? Well, the entire case went up on appeal. And Alaska only pushed – pressed certain arguments. So the district court's judgment was on appeal. And that aspect of the judgment, Alaska didn't challenge it. So just like in any other case, that stance, the holding that the claim was forfeited, disposed of that claim forever. But if we think the mandate rule is for when the prior panel actually issued a ruling on the claim, then why should that apply here if you're saying it was just forfeited so it wasn't really addressed at all by the prior panel? Well, I think it – I think the principle applies when the panel – the prior panel disposes of the claim. I don't think it has to be a merits ruling or – I haven't seen any case law to that – supporting that proposition. And the cases we cite in our brief indicate that the mandate rule applies even when a claim has been deemed forfeited in a prior appeal. Do you want to comment on 811? Yes. We agree with Alaska that, generally speaking, 811 is about access. And it's one of those provisions like 3125.3, like 3126, that Alaska relies on, that sets out a responsibility that we would have even if Alaska was implementing this program. And so even if Alaska was the entity responsible for deciding when subsistence uses could occur on federal lands, we would have to ensure that they had access. But I think – You mean you're reading it as narrowly to physical access? Yeah. Yes, as a general matter. But I would emphasize that the prior part of that, that section, supports what we're saying here because it says the Secretary shall ensure that rural residents engaged in subsistence uses shall have reasonable access. So Congress presumed that the entity responsible for managing this program would have the basic power to decide when public lands would be open to rural residents to engage in subsistence uses. And when Alaska became unable to fulfill that role, we stepped into that role and assumed that basic management responsibility. So I think 811 shows you need two things. You need the regulator to decide, here's your open season, and then you need the government to say, and we're going to make sure you can get there and get the resources. With Alaska out of the picture, we assume responsibility to do both. So you wouldn't rely on 811 then for your authority to open a hunt in this instance? Not exclusively. We think it reinforces that basic common-sense reading of the statute. And can you point me to the exact language that you said, the first half, you think? What is that language exactly? Sure. It says the Secretary shall ensure that rural residents engaged in subsistence uses. So that shows that Congress assumed, in our view, especially when read in context with the remainder of the statute, that the regulator, if it was the State or now with us, we have the logically antecedent power to decide when federal lands are open to rural residents to engage in subsistence uses. You need that. And then once you have that, you also need access. You need both. So what in the statute supports that access in this instance, Section 811, means only fiscal access? I think it's more of a practice. I'm not aware of anything in the statute. I mean, it's de novo review. The court decides what's the best reading. It's up to the court to decide now what that provision means. But we have traditionally understood that provision primarily to address access and to apply irrespective of who's managing the required rules. Fiscal access. What access? How does the federal government define the access term here? Yeah, I mean, physical access. You know, making sure roads aren't blocked, making sure areas aren't closed off, things along those lines. But physical access by itself doesn't provide subsistence. Well, I think there is a distinction between ensuring that folks have access and deciding when the season is open. Like I said, you need both. I mean, that's a basic fact. And Alaska had the opening part of it for a while. Now they don't. We stepped in and we became the manager of subsistence uses on public lands. And I think that's another important point. There seems to be, once again, some disagreement about what happened when Alaska became unable to implement this program and what kind of responsibilities shifted to the federal government. Alaska suggests, well, we could decide what rural is, what customary use is. No. We took over management of the program. And that was the issue litigated in KD John 1, and Congress confirmed that in the 1997 statute that the Organized Village of Cake cites, and I'm sure Mr. Amdur-Clark will speak to in more detail. But this is what Section 316B states there. In accordance with Title VIII of this Act, the Secretary of Interior is required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of the state law to provide a rural preference. So we don't have administrative authority. We have that too, but we have management authority. We are the manager now of public lands for subsistence uses. And perhaps the most basic component of managing the public lands for subsistence uses is deciding when they're going to be open for subsistence hunting. We've done that repeatedly. We've implemented the preference in that manner. That issue was addressed in the Ninilchik Traditional Council case cited in the briefing, where the Court agreed that providing a 10-day advanced opening for subsistence users when the season was closed to other users afforded a meaningful preference. So, I mean, that's a basic way to prioritize subsistence uses. And doing so to ensure the safety of rural Alaskans is a permissible reason. So this was a permissible action. And on that basis, the district court's decision should be affirmed. Happy to answer any other questions. Okay, neither of my colleagues have any more questions. Thank you. Thank you. May it please the Court. Nathaniel Amdur-Clark for the Organized Village of Cake. I'd just like to address two points, if I may. First, I'd note that Cake fully agrees with the United States in the district court's reading of Title VIII. It's the best reading of the statute. But I also think it's important to note that Congress has twice ratified the interpretation of the United States that the Board has the authority to open hunting seasons like the one at issue here. In both the 1997 and 1998 amendments to ANILCA, Congress affirmatively chose to leave in place the regulatory scheme that was in those 1992 regulations unless the state could implement laws that implemented the rural subsistence priority. Importantly, that regulatory scheme, the ability by which the United States manages hunting and fishing on public lands, included the regulations that underlie the actions here in basically the same form. If Congress had agreed that the state did not have this authority, it could have said so. As this court has held in the Douglas v. Yerox case, that's persuasive evidence that the interpretation is the one that Congress intended. The state's attempt to kind of hand wave this is really misplaced. From the beginning, as Mr. McArdle just mentioned, the universal understanding was that in the absence of state compliance, Title VIII allowed for federal management of hunting and fishing on federal lands. And that was a fundamental shift from state management to federal management. And that's what sort of drove multiple Alaska governors, the Alaska legislature, Congress itself, to take essentially extraordinary measures to head off that management authority, including two acts of Congress. So it's really only now, four decades later, that the state is essentially pretending that Congress only achieved a sliver of what it was intending to do back then. But Congress itself has foreclosed that interpretation. The 1997 Appropriations Act, as Mr. McArdle just read out to the court, mentions the Secretary of the Interior being required to manage hunting and fishing. That's an affirmative recognition of the Secretary's mandate to manage hunting and fishing. And managing hunting and fishing can't happen unless you can both close and open hunting and fishing seasons. That's 316B of the 1997 Appropriations Act. More specifically, though, Congress affirmatively addressed and chosen to leave in place that scheme. I'll also note that contrary to the suggestion in the state's briefing, Congress's ratification of this Secretary of Authority to set seasons and tag limits and gear restrictions, that sort of thing, does not somehow limit the ability of the Secretaries to set different seasons or tag limits or bag limits in the future. I'd also like to address quickly Section 811. We think that Section 811 supports our arguments that the Board has authority to open emergency subsistence hunts like the one at issue here. I think it's worth remembering that this all happened at the height of the COVID-19 pandemic. There were lockdowns, travel restrictions, the global supply chain was in tatters. All of rural Alaska was essentially in a state of terror and being worried about repeating the horrors of the 1918 Spanish flu epidemic. Cake only has about 500 people. It's accessible only by small plane or boat. There hadn't been, or there was basically a time of six months where there was no ferry that went to Cake. There's only two sources of food, right? Subsistence harvests and food that's brought in from outside. And the people of Cake were understandably worried about their ability to provide healthy food to protect its people and especially elders. And as mentioned earlier, there was a finding of no conservation concern here. In other words, there was a lot of reasons to allow this hunt and no reasonable reasons to deny it. We think that denying Cake's request in this sort of a context may well have been a violation of Section 811. But of course, that's not what happened. So when the community asked for the opportunity to address some of those concerns through a small-scale emergency hunt, it was continuing a way of life that has existed in Cake since time immemorial. It was doing so in furtherance of Congress's mandate to provide reasonable access and the opportunity for continued subsistence uses. Can I ask you two quick questions? So you think 811 is supportive, but you don't think that that is a statute that provides the authority? I think you could—we think you can read Section 811 more broadly, as the Court was suggesting, than either the State of the United States. I would also say we don't see anything that requires, that says it's only in physical access. But we think more broadly it supports the idea that you have to actually allow people to be able to hunt, right? And being able to allow people to hunt requires both authorization and if access only means physical access, you need both. One quick question. Of course. How did the tribe select the hunters for the hunt and decide how to distribute the food? I think it used the basically on-the-ground knowledge. I don't have anything in the record that says exactly whether they got together in a room somewhere, but it's a small community. They know who the best hunters are. And as mentioned, they only took—we looked— there was only a few, and there was— to mention the idea of Unit 3 rather than the whole state, we're looking at 864 deer and 127 moose who had been taken the previous year. This is a drop in the bucket. Through commercial and recreational hunting. Right. Through the state's hunting. Right. You said 864 moose and 124 deer? 864 deer and 127 moose, and that's from the last department. Prior year. Yep. The prior year in the area we're talking about. And that's from the state's statistics. All right. Thank you. Thank you. I don't have any more questions. I don't think my colleagues do. Thank you very much. I'd like to address two different issues, if I can hopefully get to them. So one is the scope of preemption. The Supreme Court has said to look at the scope of preemption, even when there's an express preemption clause, to look at the scope narrowly. That's Medtronic, Cipollini, Altria. And so when you look at 3202, if that has preemptive force, that cross-references Section 8 or Title 8. So that's why you have to construe everything in Title 8 narrowly. That's, for instance, why you can't construe Section 811 super broadly, because that would contravene the directions from the U.S. Supreme Court. The second point I want to make is regarding delegation. So first we have to decide whether there's a delegation, whether it's substantive, basically, or just ministerial. And then if there is a substantive delegation, it has to be both express and within Congress's authority. And here I think we all agree it's not express. So the question is — Let me ask you a question. You say you have standing to bring your improper delegation argument because you are deprived of the hunting data, and that would affect your ability to do conservation. But what about what the federal government just said, is that the state of Alaska was involved in this process. There were hearings. These are public documents. I don't see how — You need to know which person took the two deer. It's not just — yes, but it's not just that. So our brief talks about all of the different hunting data that we require, for instance, for community hunts because it helps us manage. We have to see how many prongs are — like, we have to look at the antler structure of different animals. We ask for data in areas to — from the hunters. Well, why can't you ask — I mean — Well, we can ask the tribe, but they can also say we have sovereign immunity. We can try to — Has that ever happened? Has the tribe in all of these hunts that have happened, that the federal government has opened in 95, 2016, 2012, has that ever happened where they've refused to provide that data to the state? Well, they cannot collect it and — Has that ever happened? I can't tell you — That they've refused to provide the data? I can't tell you that that has happened. What I can tell you is that the federal government has refused different times, and we've had to push and use Public Records Act. So it is publicly available? From the federal government, what the federal government collects. But when they delegate to a tribe, it's not publicly available because we can't get the information from the tribe unless the tribe volunteers that information. And sometimes it can, and sometimes it doesn't. You know of any specific example where the tribe has refused to provide that information? Can you give that to me and tell me where it is in the record? It's not in the record, and I don't think I need to provide a specific example when we're talking about a legal issue. So I want you to just take away from the facts for one moment, and I just want to give you another example of why this is a non-delegation or a delegation problem, and just take it away from wildlife. Right now we're talking about wildlife, and you're right. Not that many wildlife in this situation, but this is not the only situation that this happens in. So if we change wildlife to, for instance, oil, and we say, okay, there's a federal agency that says, we're going to allow oil development on this area for a month of land for a month of time, tribe, you get to decide who develops the oil and how to allocate that oil. Obviously we would say that's not ministerial, and it's the same thing here, just because we're talking about a different natural resource and a smaller, you know, quantity of that natural resource doesn't mean there's a delegation here. Here the tribe had to come. Thank you. You're over your time. If you want to wrap up quickly, I'd allow that. I just ask that you reverse on both of the different grounds, and that, again, you apply the canons that the U.S. Supreme Court has asked or has instructed to narrowly construe preemption when it harms the state's historic police powers throughout the entire state. Thank you. All right. Thank you to all counsel for your very helpful arguments. This matter is submitted, and we are adjourned. Thank you all.
judges: BEA, KOH, SUNG